UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re CORUS BANKSHARES, INC., | ) | |
| | ) | |
| Debtor, | ) | 12 C 9639 |
| ———————————————————— | ) | |
| | ) | Judge Feinerman |
| SALVATORE A. BARBATANO, not individually but as Litigation Trustee, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT GLICKMAN and TIM TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Salvatore Barbatano brought this adversary proceeding in his capacity as Litigation

Trustee in the Chapter 11 bankruptcy of Corus Bankshares, Inc. ("CBI"), *In re Corus*

*Bankshares, Inc.*, No. 10-26881 (Bankr. N.D. Ill.) (Hollis, J.). The six-count complaint alleges

that Robert Glickman, the CEO and a director of CBI, and Tim Taylor, CBI's chief financial

officer, breached various fiduciary duties they owed to CBI and violated the National Bank Act,

12 U.S.C. § 21 *et seq.*; the complaint also asserts a claim against Glickman for money had and

received. Doc. 1-3 at pp. 4-29. Defendants filed a motion to withdraw the reference, Doc. 1,

which this court granted, Doc. 13. Defendants now move to dismiss the complaint under Federal

Rule of Civil Procedure 12(b)(6). Doc. 14. The motion is granted. Counts I, III, V, and VI of

the complaint are dismissed with prejudice, while Counts II and IV are dismissed without

prejudice and with leave to replead.

**Background**

In considering the motion to dismiss, the court assumes the truth of the complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court also must consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the Trustee's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are set forth as favorably to the Trustee as permitted by the complaint and the other materials that must be considered on a Rule 12(b)(6) motion. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

The bankrupt in the underlying Chapter 11 proceeding, CBI, is a Minnesota corporation. Doc. 1-3 at ¶ 8. Corus Bank, N.A. ("Bank"), a national banking association, was at all relevant times a wholly owned subsidiary of CBI, which operated as the Bank's holding company. *Id*. at ¶¶ 5, 8. The complaint unhelpfully refers to CBI by several names—"Debtor," "Corus," "the Company," *id*. at ¶ 1—and also appears at times to refer to the Bank as "Corus," which generates ambiguities. These ambiguities will prove significant in the discussion below, but for now it suffices to note that the following factual account may contain errors attributable to the ambiguities. Because the court will order the Trustee to replead the claims afflicted by the ambiguities, any such errors should not affect the ultimate disposition of this case.

Glickman was at all relevant times the President, the CEO, and a director of both CBI and the Bank. *Id*. at ¶ 9. Glickman resigned from these posts in April 2009, by which time the demise of CBI and the Bank had become obvious. *Ibid*. As of his resignation date, Glickman and his family owned approximately 43% of CBI's outstanding shares. *Ibid*. This gave

Glickman effective control over who sat on CBI's and the Bank's boards, which allowed him to exercise authority over all major decisions pertaining to CBI and the Bank during the relevant period. *Ibid.* Taylor was at all relevant times the Executive Vice President and CFO of CBI. *Id.* at ¶ 10. Taylor oversaw the Bank's financial affairs and reported to Glickman. *Ibid.*

The lengthy complaint contains numerous allegations intended to convey that Defendants "failed to properly manage and supervise [CBI] and its commercial real estate lending program." *Id.* at p. 4. Because most of the specific allegations are irrelevant to the disposition of this motion, the court will rely for the most part on the following summary from the complaint, while supplying additional details as needed during the discussion of the Trustee's claims:

> Defendants are former senior officers of [CBI], who held their respective positions during the operative events. Each defendant, as officers (and Glickman also as a director) of [CBI], owed fiduciary duties to [CBI] to act in good faith, with fair dealing and the due care that an ordinarily prudent individual in a similar position would exercise under similar circumstances. These duties include, but are not limited to, the obligation to act in the best interest of [CBI] and not themselves, to ensure that effective internal controls were in place over Corus' loan processes, underwriting procedures, appraisal policy, risk management and accounting, and to present [CBI's] board of directors … with accurate financial information so as to allow the Board to make informed decisions.
>
> Defendants breached the aforementioned duties in multiple respects. By no later than mid 2007, each Defendant knew or should have known that its CRE Lending Program [CRE stands for "commercial real estate"] and its attendant portfolio of CRE loans were in serious financial trouble and threatening [CBI's] viability. But instead of curtailing CRE lending, working out troubled loans, and preserving capital of [CBI's] wholly owned subsidiary, Corus Bank, N.A. …, Defendants took acts to conceal the Bank's mounting problems, while draining the Bank of precious capital. Defendants made and approved new CRE loans and renewed and made additional loan advances on existing troubled loans without the benefit of new appraisals, often replenishing "interest reserves," which allowed borrowers to pay interest with more funds borrowed. As such, while the Bank recognized substantial amounts of non-cash income, the Bank's cash reserves were used to fund the payment of incentive awards, stock repurchases and dividends, while not appropriately setting aside reserves for loan losses, which further weakened the financial position of [CBI] causing and then deepening its insolvency.

As a result of Defendants' derelictions, [CBI] suffered millions of dollars in damages as a result of its losses from its CRE Lending Program and at least $28 million in illegal dividends to the Bank's shareholders.

*Id*. at ¶¶ 4-6.

Allegedly as a result of these misdeeds by Defendants, CBI became insolvent and, in June 2010, filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code. *Id*. at ¶ 1. In September 2011, the bankruptcy judge approved CBI's Third Amended Plan of Reorganization. *Id*. at ¶ 2. The Plan led to the establishment of a Litigation Trust, with Barbatano as its Trustee, to pursue CBI's claims against its former officers and to distribute any proceeds from those claims. *Id*. at ¶ 7. Pursuant to his authority, the Trustee commenced this adversary proceeding against Defendants. Jurisdiction lies under 28 U.S.C. § 1334(b), which provides that "the district courts shall have original … jurisdiction of all civil proceedings … arising in or related to cases under [the Bankruptcy Code]." *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995); *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161 (7th Cir. 1994) ("The reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.").

### Discussion

The complaint has six counts. Count I claims that Defendants breached the fiduciary duty of care they owed to CBI through a series of acts and omissions related to the Bank's lending program. Doc. 1-3 at ¶¶ 98-102. Count II claims that Defendants breached the fiduciary duty of loyalty they owed to CBI by causing the Bank to make high-risk loans "to mask their

problems and manipulate Corus' financial statements" when they instead should have acted conservatively and sought to preserve CBI's capital, and also that they provided materially misleading financial statements to CBI's board, thereby preventing it from acting intelligently in CBI's best interests. *Id*. at ¶¶ 106-09. Count III claims that Defendants breached their fiduciary duties to CBI by causing the Bank to issue risky loans, thereby deepening CBI's insolvency and causing waste. *Id*. at ¶¶ 113-15. Count IV claims that Glickman "breached his fiduciary duty by orchestrating a scheme whereby a third party entity, formed and controlled by Corus, purchased condominiums at the above market price of approximately $5 million." *Id*. at ¶ 119. Count V claims that Defendants caused CBI to issue dividends in violation of § 60 of the National Bank Act, 12 U.S.C. § 60. *Id*. at ¶¶ 122-29. Count VI, for money had and received, seeks to require Glickman to return the money paid to him as a CBI shareholder as a result of those allegedly unlawful dividend payments. *Id*. at ¶¶ 131-32.

Defendants contend that some of the Trustee's claims belong to the Bank rather than CBI, and that those claims therefore must be brought derivatively, which the Trustee has not sought to do and indeed cannot do because the Bank is now in FDIC receivership and only the receiver may pursue claims belonging to the Bank. The Trustee's brief "acknowledges that Counts I and III are derivative in nature and therefore withdraws them." Doc. 18 at 4. Given this concession, those counts are dismissed. The remaining counts are addressed in turn.

## I.     Count II: Breach of the Fiduciary Duty of Loyalty

After incorporating by reference ¶¶ 1-92 of the complaint, Count II alleges as follows:

> 105. The Defendants owed Corus a fiduciary duty of loyalty to act in a manner reasonably believed to be in the best interests of Corus.

> 106. The Defendants breached their fiduciary duty by:

a. implementing the New CLO Program[*] pursuant to a scheme to pump up loan originations so they could maintain the false perception that Corus was continuing to originate healthy loans throughout 2007 and 2008 when, in fact, Corus was making risky, low-quality loans for which its officers were being financially rewarded, further deteriorating its loan portfolio and deepening its insolvency; and

b. materially misstating the financials presented to the Corus Board, failing to provide the Corus Board with all relevant information concerning Corus' deteriorating capital position, and failing to provide the Corus Board with a reasonable opportunity to consider whether, in light of this information, it was in Corus' best interest to declare a dividend, repurchase shares, or approve executive compensation.

107. Defendants should have caused Corus to cease new CRE lending, aggressively work out distressed loans, increased reserves, and strengthened Bank capital.

108. Instead, in breach of their fiduciary duty of loyalty, Defendants caused and allowed the Bank to make new, high-risk CRE loans and to extend, renew and make additional advances on non-performing loans to mask their problems and manipulate Corus' financial statements.

109. Instead of increasing capital and ALLL ["allowances for loan and lease losses," ¶ 35], the Defendants authorized dividends and incentive compensation payments in breach of their duty of loyalty owed to and to the detriment of Corus. These actions divested Corus of precious capital at a time when Corus should have been focused on preservation of capital. Defendants' actions in this regard were the antithesis of good faith, care, and devotion to the best interests of Corus. As a consequence, Defendants breached their fiduciary duties of loyalty to Corus.

110. As a direct and proximate result of the Defendants' breaches of fiduciary duties, Plaintiff suffered damages in an amount to be determined at trial.

Doc. 1-3 at ¶¶ 105-10.

Defendants contend that although these allegations refer to "Corus" and the complaint expressly defines "Corus" to mean CBI, *id.* at ¶ 1, in fact many of the references to "Corus" are actually to the Bank. Defendants assert that any misdeeds they may have committed in their

---

[*] "CLO" stands for "commercial loan officers," and the complaint alleges that Defendants' "New" version of the CLO Program encouraged CLOs to make potentially risky loans by paying them commissions for originating loans without waiting, as the earlier version of the CLO Program had, to see whether the loans would in fact be repaid. Doc. 1-3 at ¶¶ 74-75.

capacities with the Bank, rather than with CBI, gave rise to claims that could be pressed directly only by the Bank. As both sides are aware, "Illinois law is well settled that a shareholder seeking relief for an injury to the corporation, rather than a direct injury to the shareholder himself, must bring his suit derivatively on behalf of the corporation." *Small v. Sussman*, 713 N.E.2d 1216, 1219 (Ill. App. 1999); *see also Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) (same); *Freed v. JPMorgan Chase Bank, N.A.*, 2012 WL 3307091, at *4-5 (N.D. Ill. Aug. 13, 2012) (same). This means that CBI, as the Bank's owner, may assert claims belonging to the Bank only through a derivative action. But there is no doubt that the Trustee has not sought to do so here, and Defendants also contend that the Trustee would be unable to do so because the Bank has gone into FDIC receivership, which precludes anyone other than the appointed FDIC receiver from pursuing claims belonging to the Bank. *See* 12 U.S.C. § 1821(d)(2)(A) ("The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to—(i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution…"); *Lubin v. Skow*, 382 F. App'x 866, 870-72 (11th Cir. 2010) (holding that § 1821(d)(2)(A)(i) precluded the trustee of a bank holding company from asserting claims that belonged to the bank itself); *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (holding that the FDIC accedes to the rights of the failed bank's shareholders under § 1821(d)(2)(A)(i)). The Trustee does not dispute either of these points—that he has not sought to sue derivatively on behalf of the Bank, and that the Bank's receivership status precludes him from doing so—and he thus has conceded Defendants' position, which appears to be correct at any rate. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are

represented by counsel, and … perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (brackets and internal quotation marks omitted).

So, the key question is: To what extent does Count II assert claims belonging to the Bank, which must be dismissed because the Trustee cannot assert them, and to what extent does Count II assert claims belonging to CBI, which may proceed unless some other basis for dismissing them exists?  The difficulty in answering this question, as already mentioned, is that many of the references to "Corus" in Count II likely refer to the Bank, or at the least are fatally ambiguous. Paragraph 106(a) refers to "the false perception that Corus was continuing to originate healthy loans throughout 2007 and 2008 when, in fact, Corus was making risky, low-quality loans." Paragraph 107 says that "Defendants should have caused Corus to cease new CRE lending." And ¶ 109 says that "Defendants authorized dividends and incentive compensation payments in breach of their duty of loyalty owed to and to the detriment of Corus" and that "[t]hese actions divested Corus of precious capital at a time when Corus should have been focused on preservation of capital."  It seems likely that these references to "Corus" are actually to the Bank, as it is unlikely that CBI, a bank holding company, was making loans itself.  Paragraph 108 suggests that the loans were made by the Bank: "Defendants caused and allowed *the Bank* to make new, high-risk CRE loans" (emphasis added).  *See also* Doc. 1-3 at ¶ 35 (same).  It also seems likely that the "incentive compensation" scheme, presumably a reference to the "New CLO Program" mentioned in ¶ 106(a), was adopted by the Bank, not by CBI.  And was it not the Bank, rather than CBI, that had a particular need to preserve its capital?

In response to Defendants' submissions, the Trustee neither admits that certain of the complaint's references to "Corus" are actually to the Bank nor asserts that every such reference

is indeed to CBI. Rather, the Trustee simply ignores the above-cited allegations and instead focuses on ¶ 106(b)'s allegation that Defendants failed to provide certain information to "the Corus Board." Doc. 18 at 5, 7-10. If the Trustee wishes to walk away from the bulk of the allegations in Count II, he ought to do so explicitly so that Defendants and the court understand the scope of this litigation going forward.

In light of this double ambiguity—as to which of Count II's references to "Corus" are to CBI and which are to the Bank, and as to which of Count II's allegations the Trustee means to pursue—Count II is dismissed without prejudice and with leave to amend. *See Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005) ("a district judge has the authority to dismiss a complaint because it is confusing, though only in a rare case would he be justified in dismissing it on this ground with prejudice, thus barring the filing of an amended complaint") (citations omitted); *see also Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible."); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading."). If the Trustee wishes to replead Count II, he should be mindful that he may not seek to assert any claims that belong to the Bank, and he should take care to explicitly distinguish between CBI and the Bank by using the labels adopted by the court: "CBI" and "the Bank." Given this disposition, it is unnecessary to address Defendants' other grounds for dismissing Count II; those other grounds can be addressed if the Trustee attempts to replead Count II in a manner that cleans up the ambiguities cited above and if Defendants then file a new motion to dismiss.

## II.    Count IV: Breach of Fiduciary Duty Against Glickman

After incorporating by reference ¶¶ 1-92 of the complaint, Count IV alleges as follows:

118.  Glickman owed Corus a fiduciary duty to act in a manner reasonably related to the best interests of Corus.

119.  Glickman breached his fiduciary duty by orchestrating a scheme whereby a third party entity, formed and controlled by Corus, purchased condominiums at the above market price of approximately $5 million.

120.  As a direct and proximate result of Glickman's breach of his fiduciary duties, Plaintiff suffered damages in an amount to be determined at trial.

Doc. 1-3 at ¶¶ 118-20.  The following factual allegations underlie Count IV:

79.  In a desperate attempt to conceal Corus' dire financial condition, and falsely stimulate the condominium market, Glickman manufactured sham condominium sales.

80.  On November 24, 2008, Colonnade Artech Owner ("Colonnade"), which was managed by four of Corus' executives and used Corus' headquarters as its principal address, bought four units, including three of the most expensive units, in the Artech Residences at Aventura, a condominium project for which Corus had provided a $130 million loan.  Colonnade, using Corus' money, paid approximately $5 million for the units.

81.  Colonnade was managed by Laguna Bay Marketing Corporation, which also used Corus' headquarters as its principal address and listed Tina Dendrinos, a loan officer for Corus, as its managing member.

82.  Prior to Colonnade's purchases, only 12 of the 235 units in the development had been sold.

83.  Glickman attempted to use these sham purchases to inflate the appraised values of the condominiums in order to delay Corus having to recognize losses on financing for these projects.

84.  As reported by the South Florida Business Journal, "[s]ales history is one of the most important factors in appraisals," and "[g]etting appraisals to match presale values has been a major challenge for many South Florida condo developers.  If the appraisals come in too low, the buyer would qualify for less financing."

85. Glickman wanted to inflate developers' sales figures to increase the likelihood of successful future sales and inflate appraisal values for the condos to ensure inflated future prices.

86. However, in implementing this scheme, Colonnade paid significantly above market value for the units. It paid $481 per square foot for one unit, when a similar unit was listed for sale at an asking price of only $388 per square foot. Glickman's sham efforts did not work.

*Id*. at ¶¶ 79-86.

In other words: The Bank made loans to developers who were building condominiums in Florida. The Bank was likely to be repaid only if the developers sold a sufficiently large proportion of the condominiums at sufficiently high prices within a sufficiently short period of time; otherwise, the developers would lack the funds necessary to repay the Bank and would default, leaving the Bank with a loss. *Id*. at ¶ 69 ("The majority of Corus' loans were non-recourse loans, which meant they were secured solely by the value of the underlying property which served as Corus' only collateral."). Toward the end of 2008, things were not looking good for the developers, as only 12 of 235 units had been purchased. As a result, the Bank would likely be forced to recognize losses on the loans—that is, it would have to admit that it could not reasonably expect to be repaid in full—leading to losses for CBI. Glickman and others at CBI sought to prevent this loss by forming a new company, Colonnade, and causing Colonnade to buy four condominium units at above-market prices "using Corus' money." *Id*. at ¶ 80. Since "sales history is one of the most important factors in appraisals," Glickman hoped that these purchases at inflated prices would lead appraisers to perceive the units as more valuable than they otherwise would, and that the higher appraisal valuations would increase the willingness of banks to make large mortgage loans to potential buyers ("[i]f the appraisals come in too low, the buyer would qualify for less financing"), which in turn would enable those potential buyers to pay the otherwise unrealistically high purchase prices that the developers had to charge to be

able to pay back their loans from the Bank. *Id.* at ¶ 84; *see also id.* at ¶ 71 ("By 2008, mortgage loans had become increasingly difficult for purchasers to obtain."). But Glickman's plan was unsuccessful: Colonnade's "sham" purchases did not lead to the additional sales to third parties that the developers needed to pay back the Bank, and so the Bank was ultimately forced to recognize a loss on the loans. Moreover, Colonnade presumably was forced to sell its four units at a loss (because it had purchased them at above-market prices), and so it was unable to repay "Corus" in full (because Colonnade made the purchases "using Corus' money").

The complaint refers to Glickman's attempt to prop up the condominium prices as a "scheme" and a "sham," and, taking the complaint's allegations as true, it indeed was a dishonest plan. Using a newly formed company, Colonnade, to disguise CBI's role, Glickman sought to mislead appraisers into believing that there was more demand for the condominiums than there actually was, and in turn to mislead banks into making more generous mortgage loans to potential buyers than they otherwise would, and presumably also to mislead potential buyers into paying higher prices for the condominiums than they otherwise would. But the Trustee does not represent any of these potential victims of Glickman's alleged plot. He represents CBI, which leads to the question of whether the claims in Count IV belong to CBI or to the Bank.

The complaint says that the condominium project was one "for which Corus had provided a $130 million loan." Doc. 1-3 at ¶ 80. As noted above, the complaint expressly defines "Corus" to mean CBI, *id.* at ¶ 1, but the usage of that term in ¶ 80 is ambiguous because presumably the Bank rather than its holding company, CBI, made the loan. The complaint then says that "Colonnade, using Corus' money, paid approximately $5 million for the units." *Id.* at ¶ 80. If this "Corus" is the Bank, then any claim must be asserted by or on behalf of the Bank rather than directly by CBI: Glickman used the Bank's money to prop up bad loans made by the

Bank to prevent the Bank from recognizing a loss, or at least to postpone its recognition of the loss. If Glickman acted improperly in doing so, then the direct harm was to the Bank, and CBI was harmed only in its capacity as the owner of the Bank, meaning that it could sue only derivatively. But if Colonnade got its $5 million from CBI rather than from the Bank, and if Colonnade's use of the money to purchase condominiums at above-market prices resulted (as the complaint implies) in Colonnade's losing some of the money and being unable to return the full sum to CBI, then CBI can indeed claim that Glickman used its money irresponsibly and ought to repay its losses.

As with Count II, this ambiguity justifies dismissing Count IV with leave to replead. *See Fidelity Nat'l Title Ins. Co. of N.Y.*, 412 F.3d at 749; *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003) ("If a complaint's length and lack of clarity make it unintelligible, dismissal under Fed. R. Civ. P. 8(a) is permitted, though leave to replead should ordinarily be granted.") (citations omitted). If the Trustee attempts to replead Count IV, he should clearly distinguish between "CBI" and "the Bank," and if Glickman again moves to dismiss, he may reassert the grounds for dismissal that were unnecessary to address in resolving this motion.

## III.    Count V: The National Bank Act

Count V alleges a violation of § 60 of the National Bank Act ("NBA"), which states:

(a) In general
Subject to subsection (b), the directors of any national bank may declare a dividend of so much of the undivided profits of the bank as the directors judge to be expedient.

(b) Approval required under certain circumstances
A national bank may not declare and pay dividends in any year in excess of an amount equal to the sum of the total of the net income of the bank for that year and the retained net income of the bank for the preceding 2 years, minus the sum of any transfers required by the Comptroller of the Currency and any transfers required to be made to a fund for the retirement of any preferred

> stock, unless the Comptroller of the Currency approves the declaration and
> payment of dividends in excess of such amount.

12 U.S.C. § 60.  The complaint alleges that the dividends paid by CBI in 2007 and 2008

exceeded the amount permitted by § 60(b) and that Defendants failed to seek or obtain approval

from the Comptroller of the Currency.  Doc. 1-3 at ¶¶ 123-26.  Much is contested between the

Trustee and Defendants, but dispositive of Count V is the fact that § 60 has no application to

dividends issued by CBI because CBI is a bank holding company and not a national bank.

By its plain terms, § 60 governs dividend payments by "a national bank."  The Trustee

does not contend that CBI is a national bank, and indeed it is not a national bank.  And although

the Bank *is* a national bank, the dividend payments of which are regulated by § 60, the Trustee

does not claim that the Bank issued any dividends in violation of that provision.  Because

Defendants could not have violated the NBA by causing CBI to issue dividends, Count V is

dismissed with prejudice.  There do not appear to be any court decisions reaching this result, but

the statute's plain text definitively resolves the matter, and "when the statute's language is plain,

the sole function of the courts—at least where the disposition required by the text is not absurd—

is to enforce it according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank,

N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted).

Citing two federal district court decisions, the Trustee argues that "Illinois courts have

always applied the NBA to bank holding companies."  Doc. 18 at 12.  It is axiomatic that "a

district court decision does not have stare decisis effect; it is not a precedent."  *Midlock v. Apple

Vacations West, Inc.*, 406 F.3d 453, 457 (7th Cir. 2005) (collecting cases).  And if the district

court decisions cited by the Trustee indeed held that § 60 governs the dividends issued by bank

holding companies, those decisions would be contrary to the statute's plain text and therefore

wrong.  But in fact those decisions held no such thing.

In the first decision, *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.*, 666 F. Supp. 1180 (N.D. Ill. 1987), the court considered a regulation promulgated under the National Bank Act, and thus applicable only to "national banking associations," that barred banks from insuring bank personnel against liability for willful misconduct. *Id*. at 1186-87. The defendants were directors and officers of both a bank and of the bank holding company that owned the bank, and the holding company rather than the bank had provided the defendants with insurance that covered willful misconduct, whether the defendants engaged in that misconduct in their capacity as bank employees or holding company employees. The defendants argued that this arrangement insulated the insurance from the regulation; the court disagreed on the ground that "[i]f accepted, that reasoning would permit Bank, a national banking association, and its directors and officers to avoid National Bank Act regulation simply because of the corporate structuring under which Bank is a … subsidiary" of the holding company. *Id*. at 1187. The court concluded:

> Any individual who serves CIC [the holding company] alone … need not confront the limitation in [the regulation]. Anyone who serves only Bank *is* subject to the regulatory prohibition. And as to anyone who occupies dual capacities with CIC and Bank, the ability or inability to insure against "willful misconduct" or like activity simply depends on which hat the individual was wearing when the activity took place. In the Underlying Litigation the individual defendants are sued in their capacities as directors and officers of both CIC and Bank. But the conduct charged in those lawsuits is unquestionably Bank-related rather than CIC-related as such. That being true, [the regulation] must control any potential indemnification for those claims— if effective regulation of national banking associations is to continue, as it must.

*Ibid*. That is, where the same individuals are officers of both the bank and the holding company, and the holding company provides them with insurance for willful misconduct that the NBA prohibits the bank from providing to its officers, the insurance is invalid to the extent that it

applies to conduct taken by the individuals in their capacity as bank officers, but not to the extent that it applies to conduct taken in their capacity as holding company officers.

The Trustee does not and could not contend that Defendants were acting in their capacity as officers of the Bank when they allegedly caused CBI to wrongfully issue dividends; Defendants indisputably were wearing their CBI hats, not their Bank hats. That renders *National Union* inapposite here. Moreover, *National Union* explicitly recognized "the applicability of the [NBA] regulation to a bank and its inapplicability to a bank holding company," and noted that bank holding companies are not subject to the NBA. *Id*. at 1187 & n.15. *National Union* therefore supports Defendants, not the Trustee.

In the Trustee's second case, *Anderson v. Atkinson*, 22 F. Supp. 853 (N.D. Ill. 1938), the receiver of an insolvent bank brought suit against the holding company that had owned the bank and against the holding company's shareholders, who had been shareholders of the bank until they created the holding company to hold the shares for them. *Id*. at 854. The complaint alleged that "the real holders and owners of approximately 95 per cent of the stock of the national bank … caused this holding company to be organized as their agency and instrumentality in furtherance of a scheme to unlawfully acquire, own, control, and operate a group of state and national banks and trust companies in violation of the laws of the United States and of the Commonwealth of Kentucky … and to use the assets of the banks and trust companies in business enterprises in which the banks and trust companies were prohibited by law [including the NBA] from engaging." *Id*. at 854-55. The complaint further alleged that the shareholders "deliberately sought to evade the provisions of the National Bank Act … which fasten personal responsibility upon bank stockholders for all the debts of the bank to an amount equal to the par value of their bank stock" and thereby "to defraud the depositors and creditors of the banks of

the protection contemplated by the statutes imposing assessment liability." *Id*. at 855. The bank failed, and when the receiver sought to levy an assessment on the bank's stockholders, he found that 95 percent of the bank stock was owned by the holding company. *Ibid*. Accordingly, the receiver decided to "proceed against [the holding company stockholders] to recover the assessment to the extent that he was unable to recover it from their holding company," which was itself "hopelessly insolvent." *Ibid*.

The question in *Anderson* was "[w]hether or not defendants may be held to be the actual and beneficial owners of the bank stock, and thus be held individually liable." *Id*. at 860. The court held that they could be held individually liable, explaining that "[t]he courts will look at the relations of parties as they actually are, or as, by reason of their conduct, they must be assumed to be, for the protection of creditors." *Id*. at 861 (quoting *Pauly v. State Loan & Trust Co.*, 165 U.S. 606, 623 (1897)). *Anderson* was, in effect, a corporate veil-piercing decision. *See Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520-21 (7th Cir. 1991) (explaining the veil-piercing doctrine). The court "look[ed] through subterfuges and apparent ownerships and fasten[ed] the liability upon the shareholder to whom the shares really belong." *Anderson*, 22 F. Supp. at 861 (quoting *Ohio Valley Nat'l Bank v. Hulitt*, 204 U.S. 162, 168 (1907)).

*Anderson* has no application here. Certainly it does not stand for the Trustee's extreme proposition that the National Bank Act applies to bank holding companies as a general matter. The rationale of *Anderson* and *National Union*—that individuals who control a bank should not be permitted to evade the NBA by creating a holding company through which to control the bank—has no bearing here. Nobody denies that, if Defendants caused the Bank to pay dividends that violated § 60(b), the Bank's receiver (or whoever currently controls it) would be entitled to sue them. The Trustee's problem is that he is suing on behalf of CBI, not on behalf of the Bank,

and that CBI's issuance of dividends is not regulated by § 60. *Anderson* and *National Union* do not speak to, or extricate the Trustee from, that problem.

## IV.    Count VI: Money Had and Received Against Glickman

The dismissal of Count V also requires the dismissal of Count VI, which seeks recovery from Glickman for money had and received, a cause of action similar or identical to unjust enrichment. *See Kaiser v. Fleming*, 735 N.E.2d 144, 147 (Ill. App. 2000) ("An action for money had and received is maintainable where defendant has received money which in equity and good conscience belongs to the plaintiff. The cause of action is one that is maintainable to recover money either under the theory of an implied contract or under the theory of a quasi contractual obligation.") (citation and internal quotation marks omitted); *SEC v. Brown*, 643 F. Supp. 2d 1077, 1083 (D. Minn. 2009) ("The theory of unjust enrichment or money had and received … has been invoked in support of claims based upon failure of consideration, fraud, mistake, and in other situations where is [*sic*] would be morally wrong for one party to enrich himself at the expense of another.") (quoting *Cady v. Bush*, 166 N.W.2d 358, 361-62 (Minn. 1969)). It is unnecessary to determine whether Illinois or Minnesota law governs Count VI, for the parties agree that the claim arises only where the person who holds the funds obtained them wrongfully.

The complaint alleges that "[b]y virtue of the illegal dividends, Glickman is in possession of money which in equity and good conscience does not belong to him." Doc. 1-3 at ¶ 131. The "dividends" are those alleged in Count V to have been "illegal" because they were paid in violation of § 60 of the NBA. Doc. 18 at 13 (where the Trustee argues: "Defendants' argument for dismissal of Count VI … once again relies upon the supposed inapplicability of the NBA to bank holding companies. As set forth above, the NBA does in fact apply to [CBI]. Glickman was not entitled to the illegal dividends [CBI] issued in violation of the NBA and therefore the

Trustee is entitled to recover those funds.").  The Trustee offers no other argument for concluding that Glickman wrongfully obtained the funds; any such argument is forfeited.  *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people.  If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (quoting *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999)).  It follows that the viability of Count VI turns exclusively on whether the NBA governs CBI's issuance of dividends.  As explained above, it does not.  And because the supposed illegality under the NBA of CBI's dividends is the only basis the Trustee gives for characterizing Glickman's receipt of dividend payments as wrongful, the Trustee has no viable claim for money had and received.  Count VI is accordingly dismissed with prejudice.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted.  Counts I and III are dismissed with prejudice because the Trustee has relinquished them.  Counts V and VI are dismissed with prejudice because repleading would be futile.  *See Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012) ("District courts have broad discretion to deny leave to amend … where the amendment would be futile.") (internal quotation marks omitted).  Counts II and IV are dismissed without prejudice and with leave to replead, in keeping with the admonitions set forth above.  The Trustee has until May 15, 2013 to file an amended complaint; if an amended complaint is filed, Defendants will have until June 5, 2013 to answer or otherwise plead.

April 23, 2013

_____
United States District Judge